J-A26038-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE MATTER OF: THE ADOPTION OF: J.R.S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: S.M.S., FATHER | : : : : : : : : | No. 593 WDA 2025 |

Appeal from the Order Dated April 15, 2025
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
11 in Adoption 2025

BEFORE:  OLSON, J., STABILE, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: December 10, 2025**

Appellant, S.M.S. ("Father"), appeals from the order entered in the Erie County Court of Common Pleas, Orphans' Court, which granted the petition filed by the Erie County Office of Children and Youth ("OCY") for involuntary termination of Father's parental rights to J.R.S. ("Child").  We affirm.

The relevant facts and procedural history of this case are as follows. Father was incarcerated at the time of Child's birth.  On October 8, 2024, shortly after Child's birth, Child was removed from his mother, T.L.B.'s ("Mother") custody because Mother tested positive for methamphetamine, cocaine and marijuana while she was pregnant with Child.  Child was placed in kinship care with Child's maternal aunt, T.B. ("Maternal Aunt").  On October 14, 2024, OCY filed a dependency petition alleging that Child was without proper parental care or control.  The petition stated that Father, who was identified as Child's putative father at the time, was incarcerated with pending

charges and had a lengthy criminal history. The petition further raised concerns of domestic abuse between Father and Mother. Specifically, OCY noted an incident in July of 2024, when Father was violent towards Mother, resulting in police intervention and Father's arrest. When Father was arrested, the police recovered a crack and meth pipe from Father's person. The petition further stated that Father has serious mental health concerns that remain untreated, including diagnoses of schizoaffective disorder-bipolar type, schizophrenia, anxiety disorder and major depressive disorder. On October 22, 2024, the Orphans' Court adjudicated Child dependent with the goal of reunification. The court further determined that Child should remain in kinship placement with Maternal Aunt. At the hearing, Father stipulated to the allegations set forth in the dependency petition.

Father also agreed to the following treatment plan: 1) submit to genetic testing to establish paternity; 2) participate in an approved parenting program; 3) obtain and maintain safe and stable housing; 4) refrain from the use of drugs and alcohol and submit to random urinalysis testing; 5) cooperate and communicate with OCY workers; 6) attend medical appointments and follow all recommendations; 7) demonstrate the ability to provide for Child's physical needs through employment or other resources; 8) participate in mental health services and follow all recommendations; 9) participate in a drug and alcohol assessment and follow all recommendations; and 10) participate in an anger management class.

On January 27, 2024, the court held a permanency review hearing.

Father, who was no longer incarcerated at this point, did not attend the hearing. OCY petitioned the court to change the goal from reunification to adoption. In support of its request, OCY reported that since he has been released from prison, Father failed to comply with any part of his treatment plan. Specifically, Father had not undergone testing to establish paternity, a drug and alcohol assessment, a mental health assessment, and stopped attending urinalysis testing. At the conclusion of the hearing, the court changed the goal to adoption. On February 5, 2025, OCY petitioned the court to involuntarily terminate Father's parental rights to Child.

The court conducted a termination hearing on April 10, 2025. At the beginning of the hearing, Child's attorney requested the court to find that Child's legal and best interests are merged because Child is only six months old and unable to articulate a legal position. The court agreed and found that Child's legal and best interests were aligned.

Katelyn Szewczyk, an OCY caseworker, testified that when Child was removed, OCY had concerns regarding Father's ability to care for Child due to Father's incarceration and criminal history, history of domestic abuse with Mother, lack of stable housing or employment, and untreated mental health and substance abuse issues. Father was incarcerated at the time of Child's birth and was released in October of 2024. Father has an extensive criminal history dating back to 2006, consisting of multiple retail theft and drug related convictions. Father was arrested again due to a new charge of retail theft and violation of his probation in February of 2025, and was still incarcerated at the

time of the termination hearing.

At the commencement of this case, Father was identified as Child's putative father. Father told Ms. Szewczyk on multiple occasions that he believed he was Child's father. Father's treatment plan directed him to participate in genetic testing to confirm paternity. At the adjudication hearing on October 22, 2024, Ms. Szewczyk informed Father that he could undergo genetic testing to confirm paternity that day in the same building. Father did not follow through. Father also did not attend a scheduled testing appointment on December 5, 2024. When she asked Father why he had not submitted to testing, Father told Ms. Szewczyk that he had attempted to get tested at domestic relations on a different day and was turned away. Father did not tell her what day he attempted to do so. Ms. Szewczyk testified that domestic relations would not typically turn someone away even if they do not have a scheduled appointment.

As of the permanency review hearing on January 27, 2025, Father had not undergone testing to establish paternity. Due to Father's non-compliance, the court permitted genetic testing to be done using a prior sample provided by Father. Father's paternity was confirmed on February 23, 2025. When Ms. Szewczyk informed Father that his paternity was confirmed, Father stated that he did not believe he was Child's father and wanted more testing done, which was contrary to his prior statements. Due to the delay in establishing paternity and the goal change at the January 27, 2025 permanency review hearing, Father had not had any visits with Child.

Ms. Szewczyk further testified that during the time that Father was not incarcerated, Father did not establish stable housing. Father stayed with Mother at a shelter called The Refuge for a few weeks. Father and Mother voluntarily left The Refuge on November 19, 2024. Father stopped communicating with Ms. Szewczyk after this point. Ms. Szewczyk only reestablished contact after Father was incarcerated again. Father also did not make any progress on the rest of his treatment plan. Father did not take steps to address the concerns of domestic abuse with Mother and did not participate in an anger management class. Father continues to be in a codependent relationship with Mother. Father did not engage in services to seek treatment for his mental health diagnoses or undergo a drug and alcohol assessment. Father underwent urinalysis testing and tested negative for six tests between October 27, 2024 and November 12, 2024. After this point, Father failed to appear for 19 urinalysis tests.

Ms. Szewczyk testified that Father has not taken any actions to parent Child while he was incarcerated or when he was out of prison. Father did not ask about Child's wellbeing when Ms. Szewczyk went to visit him in prison. Father has also not made any proactive efforts to visit Child or give gifts to Child. Ms. Szewczyk opined that even if Father was immediately released from prison, he would not be in a position to parent Child. Child does not have any relationship with Father. As such, she did not believe that there would be a negative effect on Child if the court involuntarily terminated Father's parental rights.

Additionally, Ms. Szewczyk testified that Child is doing well in Maternal Aunt's care. Maternal Aunt provides for all of Child's needs and is loving and attentive towards him. Child's siblings are also in the same residence. Ms. Szewczyk opined that due to Father's failure to make any progress on his treatment plan and inability to provide a safe and stable environment for Child, it would be in Child's best interest to remain in Maternal Aunt's care.

Michael Vicander, an OCY permanency caseworker, testified that he has observed Maternal Aunt's interactions with Child. Maternal Aunt has a very natural mother-child relationship with Child. Mr. Vicander has no concerns about Maternal Aunt's care of Child, and she meets all of Child's physical, mental, and emotional needs. Child is well bonded with Maternal Aunt. Mr. Vicander opined that Child would not suffer negative effects if Father's parental rights were involuntarily terminated.

Father testified that he expected that his pending criminal charges would be dismissed and that he would be released from prison at a hearing on April 16, 2025. Father initially denied that he violated his probation but admitted on cross examination that he was incarcerated due to a probation detainer. Father also initially denied that he had any drug related convictions in his criminal history but admitted to several prior drug related convictions during cross examination. Father stated that he has housing set up for when he is released from prison and can return to work at his prior employment as a sanitation worker. Father stated that he has been clean for approximately four to five months and has a sponsor. Father stated that he was taking

medication for his mental health struggles and attempting to turn his life around.

Father stated that he had visits with Child sometime in October of 2024 but could not remember the dates when the visits occurred. Father then stated that he was told that he could not have visits with Child until paternity was established. He denied that Ms. Szewczyk gave him information about testing on the day of the adjudication hearing. Father stated that he attempted to get tested a week later but was turned away. Father stated that he stopped submitting to urinalysis testing because his parole officer told him that he did not need to take the tests because he was not legally confirmed as Child's father.

Father testified that he went to Michigan for approximately two months. Father could not recall exactly when he went to Michigan but approximated that it was sometime in early November of 2024. Father said he went to Michigan because his mother and aunt died. He clarified that his mother died in 2022, but his aunt died towards the end of the year in 2024. Father stated that he did not inform OCY that he went to Michigan or maintain communication with OCY workers because he was having a difficult time. Father initially stated that he was not present at the permanency review hearing on January 27, 2025 because he was in Michigan but subsequently stated that he returned from Michigan on January 10, 2025. Father then stated that he did not attend the hearing because he did not know it was occurring.

Father reported that he was receiving mental health treatment and taking medication before he left for Michigan. Father acknowledged on cross examination that he did not have any documentation to substantiate this and did not previously provide any such documentation to OCY workers. He stated that he is also currently receiving mental health treatment and taking medication while he is incarcerated. Father reported that he is participating in anger management classes and attempting to take GED classes while incarcerated. Father stated that he loves Child and would be able to take care of Child after he is released from prison. Father stated that he has other children with a different mother and has partial custody of them.

Father testified that he and Mother are not currently together but also stated that they were going to be together for life. Father described his July 2024 physical altercation with Mother as a "little argument." When asked what caused the altercation, Father stated:

> Why I did that with [Mother] is because … I was at work and [Mother] called OCY and told OCY I'm taking my kids to my mom's house, and I'm going to do me, and I'm going to rehab, and I was mad as hell, excuse my language, when she did that because we just got our kids back, so I was mad at her about that. So she relapsed. I came home, and I chased her ass down, and I was ready to beat her butt. Yes, I did, but I didn't hit her.

(N.T. Termination Hearing, 4/10/25, at 96-97).

Child's attorney opined that there would be no detriment to Child by terminating Father's parental rights to Child. Child's counsel noted that Father has not made any meaningful progress towards demonstrating that he can

- 8 -

parent Child. Child needs stability and continuity. As such, Child's best interests are served by terminating Father's parental rights and maintaining his current placement with Maternal Aunt, with whom Child is well bonded.

On April 14, 2025, the court involuntarily terminated Father's parental rights to Child.[1] On May 13, 2025, Father filed a timely notice of appeal and a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises the following issues for our review:

> 1. Whether the [Orphans' Court] erred in terminating [Father's] parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) where the agency failed to provide sufficient reunification services and prematurely changed the goal to adoption after only three months and before paternity was established.
>
> 2. Whether the [Orphans' Court] erred in determining that termination of parental rights best served the developmental, physical, and emotional needs and welfare of the child under 23 Pa.C.S. § 2511(b).

(Father's Brief at 6).

In his issues combined, Father asserts that OCY did not afford Father a reasonable period of time to engage in reunification services and work on his treatment plan before filing a petition to involuntarily terminate his parental rights to Child. Father claims that when he was not incarcerated, he was

---

[1] The court also involuntarily terminated Mother's parental rights to Child in the same proceeding. Mother filed a separate notice of appeal, docketed in this Court at No. 594 WDA 2025.

employed, had stable housing, engaged in mental health services, and tested negative for several drug screens. Father argues that he provided valid reasons for his inability to continuously engage in services, and he was not given enough time to re-engage in services before OCY sought to change the goal to adoption. Father asserts that the court changed the goal to adoption before Father's paternity was even confirmed. Father contends that given the shortened time frame, OCY failed to establish that Father's incapacity to parent Child cannot or will not be remedied. Additionally, Father claims that there was insufficient evidence that termination served Child's needs and welfare because Father was not given an opportunity to bond with Child. Father concludes that the court erred in finding that involuntary termination of his parental rights to Child was proper pursuant to Sections 2511(a)(2) and (b). We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order

- 10 -

> to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

The Orphans' Court granted involuntary termination of Father's parental rights to Child on the following grounds:

### § 2511. Grounds for involuntary termination

   **(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the

- 11 -

following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b)  Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).  "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions."  **In re Z.P., supra** at 1117.  When conducting a termination analysis:

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of…his parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re Z.P., supra* at 1117. "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 1117-18. Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

With respect to incarcerated parents:

> [A] parent's absence or failure to support his or her child due to incarceration is not, in itself, conclusively determinative of the question of parental abandonment. Indeed, incarceration alone is not an explicit basis upon which an involuntary termination may be ordered pursuant to Section 2511 of the … Adoption Code. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison to continue to pursue a close relationship with the child[.] An incarcerated parent desiring to retain parental rights must exert him—or herself to take and maintain a place of importance in the child's life.

> * * *

> [T]his Court has never adopted or countenanced a view that incarceration alone ... represents appropriate and sufficient

- 13 -

> grounds for the involuntary termination of parental rights….
> [W]hen a parent uses the opportunities that are available in prison to make sincere efforts to maintain a place of importance in the lives of his or her children, incarceration alone will not serve as grounds for the involuntary termination of his or her parental rights under Section 2511(a)(1).

*In re T.L.H.*, 336 A.3d 1069, 1081 (Pa.Super. 2025) (quoting *In re R.I.S.*, 614 Pa. 275, 284-87, 36 A.3d 567, 572-74 (2011)).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the parental bond is "necessary and beneficial to the child;" (2) "the child's need for

- 14 -

permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Importantly, the *K.T.* Court's decision is particularly relevant to an analysis of an existing parental-bond. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

Instantly, the court found that Father's testimony lacked credibility because it was rambling, repetitive, and nonsensical. Our review of the record confirms the court's assessment. *See In re Z.P., supra*. Father's testimony was unfocused and repetitive, jumping from topic to topic, and often unresponsive to the questions being asked of him. Father was asked several times to slow down when he was speaking and refrain from talking over others. Father also contradicted himself several times.

Father complains on appeal that he was not afforded a reasonable period

of time to engage in reunification services because the court changed the goal to adoption before paternity was established. The court credited Ms. Szewczyk's testimony regarding Father's failure to take action to establish paternity. Ms. Szewczyk testified that Father told her on multiple occasions that he believed he was Child's father. Nevertheless, Father failed to provide a sample for genetic testing to establish paternity despite being given several opportunities to do so before the goal was changed to adoption. As of the permanency review hearing on January 27, 2025 when the goal was changed to adoption, Father had not submitted to testing and had stopped communicating with OCY workers. Due to Father's failure to comply, the court permitted the use of an old sample for testing. Consequently, paternity was not confirmed until February 23, 2025, which was nearly four months after Child was adjudicated dependent. The court did not find credible Father's explanations for why he was unable to submit to testing. As such, it was Father's own failure to submit to genetic testing and communicate with OCY workers that delayed the confirmation of paternity until after the goal was changed to adoption.

Additionally, Ms. Szewczyk testified that Father did not take any steps to progress on his treatment plan before the filing of the involuntary termination petition. Regardless of whether he was incarcerated or released from prison, Father did not put forth any effort to parent Child. **_See In re_** **_T.L.H., supra_**. Father did not have any visits with Child due to his failure to

confirm paternity in a timely manner.[2] Father also admitted that when he was released from prison, he went to Michigan for two months without informing OCY and did not maintain communication with OCY workers during this time. Father was entirely non-compliant with the treatment plan during this time. Father did not provide confirmation of stable housing, employment, or mental health treatment to OCY workers. Additionally, Father's minimization of his prior violent altercation with Mother during his testimony demonstrated that concerns about domestic abuse continue to be present in his relationship with Mother. Further, Father has an extensive criminal history and was incarcerated at the time of Child's birth and at the time of the termination hearing on separate charges. As such, the court found that Father's refusal to engage in services, cooperate with OCY, and make any progress on his treatment plan throughout the pendency of this case evidenced that Father was unable or unwilling to remedy the causes of his incapacity to parent Child. *See In Interest of Lilley, supra*. On this record, we cannot say the court erred in finding that termination of Father's parental rights to Child was warranted under Section 2511(a)(2). *See In re Z.P., supra*.

Regarding Section 2511(b), the court found that there is no bond

---

[2] While Father testified that he had visits with Child, he could not recall when these visits occurred. Father also contradicted himself, testifying that he was not permitted visits until paternity was confirmed.

between Father and Child as Father has not had visits with Child.[3] ***See In re K.Z.S., supra***. Ms. Szewczyk, Mr. Vicander, and Child's attorney opined that Child would not suffer any detriment if Father's parental rights to Child were involuntarily terminated. Additionally, Child is doing well in Maternal Aunt's care, who is an adoptive resource and is also caring for Child's siblings. Ms. Szewczyk and Mr. Vicander testified that Maternal Aunt provides for all of Child's needs and Child is well bonded to Maternal Aunt. On this record, we discern no abuse of discretion in the court's determination that Child's welfare is best served by termination of Father's parental rights to Child. ***See In re Z.P., supra***. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/10/2025

---

[3] Even if Father had visits with Child as he testified, Father stated that these visits occurred in October of 2024, when Child was a newborn. Father has not seen Child since then.